# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

MATTHEW C.,                                :
  *Plaintiff*,                              :
                                     :

v.                                         :          Civil No. 3:25-CV-00010 (VAB)

                                       :

FRANK BISIGNANO,                           :
COMMISSIONER OF SOCIAL                     :
SECURITY,                                  :
  *Defendant*.                              :

## RULING AND ORDER ON PENDING MOTIONS

Matthew C.[1] has filed an administrative appeal under 42 U.S.C. § 405(g) against Frank J.

Bisignano, the Commissioner of Social Security ("Defendant" or "Commissioner"), following

the denial of his application for disability insurance benefits ("DIB") and supplemental security

income benefits ("SSI").[2]

The Commissioner moves the Court to enter judgment affirming his final decision. Mem.

of L. in Support of Commissioner's Mot. for an Order Affirming the Commissioner's Decision,

ECF No. 17, 1 ("Def.'s Mem."). Matthew C. has moved the Court for an order reversing the

decision of the Commissioner and remanding for the sole purpose of calculating benefits. Pl.'s

---

[1] In opinions issued in cases filed under Section 405(g) of the Social Security Act, 42 U.S.C. § 405(g), this Court will identify and refer to any non-government party solely by first name and last initial in order to protect the privacy interests of Social Security litigants while maintaining public access to judicial records. *See* Standing Order – Social Security Cases, ECF No. 5 (Dec. 19, 2022).

[2] Under the Social Security Act, the "Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under [the Act]." 42 U.S.C. § 405(b)(1). The Commissioner's authority to make such findings and decisions is delegated to administrative law judges ("ALJs"). *See* C.F.R. §§ 404.929 *et seq.* Claimants can in turn appeal an ALJ's decision to the Social Security Appeals Council. *See* 20 C.F.R. §§ 404.967 *et seq.* If the appeals council declines review or affirms the ALJ opinion, the claimant may appeal to the United States district court. Section 205(g) of the Social Security Act provides that "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

Mot. to Reverse the Decision of the Commissioner, ECF No. 13, 22 ("Pl.'s Mem.").

Alternatively, Matthew C. moves the Court to reverse the decision of the Commissioner and

remand the matter for a *de novo* hearing and new decision. *Id.* Matthew C. also asks the Court to

approve an award of attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412. *Id.*

The issues presented are (1) whether the Administrative Law Judge ("ALJ") adequately

developed the evidence of record and (2) whether the ALJ properly assessed the medical source

opinions in the record.

For the reasons explained below, Matthew C.'s motion is **DENIED** and the

Commissioner's motion for an order affirming his decision is **GRANTED**.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

#### i.   Medical Conditions and Diagnoses

Matthew C. has been diagnosed with generalized anxiety disorder, autism spectrum

disorder, alcohol use disorder in remission, attention deficit disorder, attention deficit

hyperactivity disorder, and depressive disorder. Administrative Transcript, 269-85, 294-96, 299-

302, 383-84, ECF No. 10 ("Tr."). He alleges a disability onset date of January 1, 2017. *Id.* at 21.

Matthew C.'s records indicate that he had been in counseling for his mental health

conditions "for years" and predating his alleged onset date of disability, during which time he

was taking medication to treat his symptoms. *Id.* at 415. On May 24, 2017, Matthew C. began

seeing Licensed Marriage and Family Therapist ("LMFT") Shane Miller at The Christian

Counseling and Family Life Center. On June 8, 2017, Matthew C. reported having panic attacks

two to three times a month and was seeking medication management. *Id.* at 416. On July 13,

2017, he reported experiencing anxiety every day and attempting to ignore his feelings. LMFT

Miller noted that Matthew C.'s medication seemed to be helping his anxiety and that he "was motivated to go to school to learn to be a vet tech but is so anxious that the anxiety stops him." *Id.* at 421. On July 12, 2017, Matthew C. reported his mood as "pretty good" and noted that his anxiety would "come[] and go[]." *Id.* at 413. LMFT Miller also stated that Matthew C. "had issues with drinking" and noted that his anxiety continued to interfere with his plans for schooling. *Id.*

On July 20, 2017, Matthew C. saw Dr. Kim Owen, MD, also at The Christian Counseling and Family Life Center. On September 13, 2017, Matthew C. reported feeling "not that good" following the sudden death of his pet rabbit. *Id.* at 411. On October 2, Dr. Owen stated that Matthew C. was "still upset over [the] loss of [his] rabbit." Dr. Owen increased his medication dosage and suggested that he continue seeing LMFT Miller for therapy, to which Matthew C. agreed. *Id.*

On October 5, 2017, Matthew C. told LMFT Miller that he did not believe his medication was working and reported taking himself off of certain medications. *Id.* at 422. On November 28, 2017, LMFT Miller observed that Matthew C. was calmer and a little less anxious. *Id.* at 423. Matthew C. reported that it was easier to concentrate. *Id.*

On January 18, 2018, LMFT Miller met with Matthew C.'s mother, who expressed concern about her son. *Id.* at 424. She noted that Matthew C. was using marijuana to self-medicate on occasion. *Id.* On April 19, 2018, he reported being sober from alcohol for three years. *Id.* at 426.

On June 7, 2018, Matthew C. saw physician assistant ("PA") Skylar Robinson at Hartford HealthCare for a physical examination. *Id.* at 294-97. She observed Matthew C. was attentive, active, and alert; that he had normal recent and remote memory cognition level; and that his

insight, judgment, and thought processes were intact. *Id.* at 296. On September 12, 2018, Matthew C. saw PA Robinson for a follow-up appointment, during which she observed major depressive disorder that would continue to be treated by Dr. Owen. *Id.* at 301.

On November 29, 2018, Matthew C. reported to Dr. Owen that he was experiencing only "a little anxiety" that fluctuated throughout the day. *Id.* at 445. He noted he generally had good control over his anxiety and that he continued to self-medicate with marijuana. *Id.*

On June 13, 2019, Matthew C. told Dr. Owen that he had been feeling calmer and had been experiencing fewer panic attacks, with the last one occurring two to three months ago. *Id.* at 453. Nonetheless, he reported sleeping a lot with an average anxiety level of five out of ten. *Id.* He noted getting angry on occasion and stated that when he gets very anxious, he will shut down and go to his room. *Id.* He stated that other than these episodes, he goes out every day, is happy in his room with hobbies, and has been attending classes to become a veterinary technician at a community college. *Id.* at 455.

On August 12, 2019, Matthew C. told LMFT Miller that he was upset because he did not pass the exam to be a veterinary technician. *Id.* at 452. He also told Dr. Owen that his current anxiety level was five out of ten, which he reported being normal for him. *Id.* He stated that his current medication had been the most helpful with his anxiety and that he no longer experienced panic attacks. *Id.*

On September 11, 2019, LMFT Miller noted that Matthew C. had been non-compliant with his therapy sessions. *Id.* at 451. On September 23, 2019, Matthew C. told Dr. Owen he was in a good mood but had chronic worry and anxiety. *Id.* On November 11, 2019, Dr. Owen cancelled a medication maintenance visit because of his non-compliance with therapy sessions. *Id.* at 450.

On December 26, 2019, Matthew C. saw Dr. Owen to discuss the possibility of obtaining medical marijuana. *Id.* at 447-58. Dr. Owen examined Matthew C. for post-traumatic stress disorder ("PTSD"), and found that he did not meet the criteria for a diagnosis. *Id.* On January 23, 2020, Matthew C. did not come to his appointment with Dr. Owen. *Id.* at 443. Dr. Owen noted that his father had called earlier in the month to ask about her determination that Matthew C. did not have PTSD, but that Matthew C. would not come to the phone. *Id.* She also stated that Matthew C. had called the previous week to say he would only come in on Mondays for an appointment, but he failed to cancel the January 23 appointment, which fell on a Thursday. *Id.* On February 3, 2020, Matthew C. stated he was "mad and confused" that his condition did not meet the criteria for PTSD. *Id.* at 439.

Between 2020 and 2022, Matthew C. saw Dr. Deepthi Naik, MD at Hartford HealthCare for physical examinations that yielded benign results with the exception of obesity, occasional leg pain, and chest pain. *Id.* at 312-15, 318-28, 329-38, 340-48, 363-74.

On March 23, 2021, Dr. Owen saw Matthew C., who said he was "pretty good" and "usually fine, just anxious." *Id.* at 284. He stated that he was "never bored," was staying in contact with his professor about internship placements, and was able to go out and shop. *Id.* On June 17, 2021, Matthew C. said he was "pretty good" and noted taking Klonapin and smoking marijuana a few times a day. *Id.* at 282. Dr. Owen noted that he managed his anxiety "fairly well" and stated he was "content with [his] current life style." *Id.* at 283. She also opined that he was not abusing the Klonapin. *Id.* On August 2, 2021, Matthew C. reported wanting to return to therapy when he and his therapist could meet in person again. *Id.* at 280.

On September 20, 2021, Matthew C. reported feeling "okay" and expressed interest in Section 8 housing and social security disability benefits. *Id.* at 277. He stated that he had worked

with an organization in Bridgeport regarding job placements in the past but believed he did not need a job coach or help getting a job. *Id.* On January 20, 2022, Matthew C. stated he had started applying for jobs at a pet store and denied depression. He also reported chronic marijuana use. *Id.* at 274. On March 31, 2022, Matthew C. reported feeling "pretty good." *Id.* at 271. On June 23, 2022, he stated that he was pursuing work, that his anxiety had stabilized with medication, and that he may not need to continue using Klonapin in the evenings. *Id.* at 270. On December 15, 2022, Matthew C. said he was "doing pretty good" and said his anxiety was stabilized with his medication. *Id.* at 383-84.

On March 16, 2023, Matthew C. reported working part-time with a food delivery service and said he was "usually happy." *Id.* at 385. On May 11, 2023, Matthew C. said he had recently quit smoking marijuana. *Id.* at 395. He reported having a "mental breakdown" that lasted about a week regarding his relationship with his parents. *Id.* On June 15, 2023, Matthew C. reported feeling "more depressed" over the past couple of months due to several factors, including problems with his parents. *Id.* at 397. He stated he needed something for his depression. *Id.* Dr. Owen observed that while his motivation was somewhat less, he continued to enjoy his usual activities, and his energy, appetite, and sleep remained unchanged. *Id.* He also demonstrated heightened anger, irritability, and anxiety due to denied social security disability benefits and LMFT Miller's departure from the practice. *Id.* at 398. Dr. Owen said the "most important intervention" at this juncture was assigning a new therapist who could meet with him in person. *Id.*

On July 24, 2023, Dr. Owen noted that Matthew C. missed his first appointment with his new therapist, Jill Bennett. *Id.* at 401. He also stated worsening depression and anxiety due to caring for his parents, resulting in resuming marijuana usage. *Id.* Dr. Owen increased his

Klonapin to better manage his anxiety. *Id.* at 402. On August 2, 2023, Matthew C. presented for his initial evaluation with Jill Bennett, who opined that he presented with a normal mood and thought process, that he had low normal attention and concentration, somewhat impaired remote memory, and presented with anxiety symptoms and a learning disorder. *Id.* at 403-404. On August 24, 2023, Matthew C. told Dr. Owen that he was "pretty good." *Id.* at 406.

   ii.   Medical Opinions and Assessments

The record contains four medical source statements from Matthew C.'s psychiatrist, Dr. Kim Owen.

On August 26, 2022, Dr. Owen completed a mental health questionnaire in which she stated that his anxiety in recent years had been due to the job search. Tr. at 289. She opined that his ability to function independently and maintain attention and concentration was fair. *Id.* at 290. She opined that his ability to behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability were all fair, and his ability to maintain his personal appearance was good. *Id.* Finally, she opined that he experienced anxiety due to his autism, as well as a learning disability, which prevented him from starting and completing tasks and relating to others. *Id.* at 291.

On March 16, 2023, Dr. Owen completed a mental health questionnaire in which she stated that he required a higher dose of Klonapin to manage his anxiety when completing errands. *Id.* at 388-90. She opined that Matthew C.'s ability to interact with the public, deal with work stresses, function independently, and carry out complex job instructions were poor; she rated all other abilities as either fair or good. *Id.* at 389. She also opined that he "may be able to do some job tasks on a part-time basis" but doubted that he could maintain a full-time position. *Id.* at 390.

On October 9, 2023, Dr. Owen completed a mental capacity statement in which she stated that Matthew C.'s impairments have lasted since his alleged onset date of January 1, 2017. *Id.* at 391. In this statement, Dr. Owen opined that for five percent of the workday, Matthew C. would be unable to maintain socially appropriate behavior and unable to adhere to basic standards of neatness and cleanliness. *Id.* at 392. She opined that for ten percent of the workday, Matthew C. would be unable to remember locations and work-like procedures; make simple work-related decisions; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. *Id.*

She also opined that for fifteen percent or more of the workday, he would be unable to understand and remember detailed instructions; maintain attention and concentration for extended periods of time; perform activities within a schedule, maintain regular attendance, and be punctual and within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; respond appropriately to changes in the work setting; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others. *Id.* at 392-93.

She stated that Matthew C. would be "off-task" for more than thirty percent of the day, absent from work five days or more per month, unable to complete a workday five days or more per month, and perform his job on a sustained basis less than fifty percent of the time. *Id.* at 393-94.

On July 1, 2024, Dr. Owen submitted a letter to Matthew C.'s attorney in which she opined that "he would not have been able to function in any job setting from July 2017 through the end of 2019" and "from early 2020 to March 2021." *Id.* at 9. She noted "aggressive" and "angry" tendencies and opined he would not be able to function in a work environment for more than one to two hours for two to three days per week. *Id.*

The record also contains opinions from state agency consultants. On August 30, 2022, Michelle Leveille, Psy. D., opined that Matthew C. was not disabled. *Id.* at 67-74. On May 18, 2023, Susan Uber, PhD, stated that "although [his] psychiatrist opines that [Matthew C.] could not tolerate the stress of working fulltime, his treatment notes do not support this position." *Id.* at 81. She opined that "anxiety may on occasion (here defined as less than one third total working time) disrupt optimal performance and productivity, however he retains the capacity to engage with adequate [concentration, persistence, and pace] in tasks of up to moderate complexity, up to physical limits, on a fulltime basis." *Id.* at 83.

With regard to his social interaction limitations, Dr. Uber stated that his "social anxiety and low stress tolerance limit his ability to engage in close/frequent work with the public. He can accept supervisory direction, but may on occasion distract coworkers with anxious reactivity or odd relatedness. He can maintain appropriate appearance. He would be best off working independently, with little need for contact/collaboration with coworkers." *Id.* at 83-84. Next, she opined that "[d]ue to reduced stress tolerance, [Matthew C.] may have occasional difficulty managing work pressures/changes in work routine. He is best off with a relatively unchanging set of work responsibilities in a quiet and low-key work setting." *Id.* at 84. Finally, she opined that Matthew C. was limited to unskilled work because of his mental impairments and identified three occupations that would conform with his residual functional capacity ("RFC"). *Id.* at 93-94.

**B.  Procedural History**

On April 26, 2022, Matthew C. filed an application for Title II Social Security DIB and Title XVI SSI alleging he had been disabled from January 1, 2017. Tr. at 191.

On September 12, 2022, Matthew C.'s application was denied by an ALJ. *Id.* at 95-104.

On November 9, 2022, Matthew C. filed a request for reconsideration, *id.* at 144, which was denied on May 18, 2023, *id.* at 106-112.

On June 27, 2023, Matthew C. requested a hearing before an ALJ. *Id.* at 115.

On October 24, 2023, ALJ Eskunder Boyd held a hearing, *id.* at 164, and on February 8, 2024, ALJ Boyd issued an unfavorable decision, denying Matthew C.'s claim in its entirety, *id.* at 15.

Matthew C. filed a request for review with the Appeals Council, which the Council denied on November 7, 2024. *Id.* at 1-5. ALJ Boyd's decision became the final, appealable decision of the Commissioner.

On January 1, 2025, Matthew C. appealed the Commissioner's final decision to this Court, and on April 28, 2025, Matthew C. filed a motion to reverse the decision of the Commissioner. Pl.'s Mem.

On June 24, 2025, the Commissioner filed a motion to affirm the decision of the Commissioner. Def.'s Mem.

## II.    STANDARD OF REVIEW

Under section 405(g) of the Social Security Act, 42 U.S.C. § 405(g), a district court reviewing a final decision of the Commissioner of Social Security "is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). A district court reviewing a disability determination "must determine whether the Commissioner's conclusions 'are supported

by substantial evidence in the record as a whole or are based on an erroneous legal standard.'"

*Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (quoting *Beauvoir v. Chater*, 104 F.3d 1432,

1433 (2d Cir. 1997)). The court may not make a *de novo* determination of whether a plaintiff is

disabled in reviewing a denial of disability benefits. *Wagner v. Sec'y of Health & Hum. Servs.*,

906 F.2d 856, 860 (2d Cir. 1990). Rather, the court's function is to ascertain whether the

Commissioner applied the correct legal principles in reaching his/her conclusion, and whether

the decision is supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir.

1987).

"Substantial evidence is 'more than a mere scintilla.'" *Brault v. Soc. Sec. Admin.,*

*Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (quoting *Moran v. Astrue*, 569 F.3d 108,

112 (2d Cir. 2009)). "It means such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Moran*, 569 F.3d at 112. It is a "very deferential standard of

review—even more so than the 'clearly erroneous' standard." *Brault*, 683 F.3d at 448 (citing

*Dickinson v. Zurko*, 527 U.S. 150, 153 (1999)). To determine "whether the agency's findings are

supported by substantial evidence, 'the reviewing court is required to examine the entire record,

including contradictory evidence and evidence from which conflicting inferences can be

drawn.'" *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *Mongeur v. Heckler*, 722

F.2d 1033, 1038 (2d Cir. 1983) (per curiam)).

A court has the power "to enter, upon the pleadings and transcript of record, a judgment

affirming, modifying, or reversing the decision of the [Commissioner], with or without

remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see Shalala v. Schaefer*, 509 U.S. 292,

297 (1993). The court may remand to the agency for further proceedings in cases where the

Commissioner "has failed to provide a full and fair hearing, to make explicit findings, or to have

correctly appl[ied] the law and regulations." *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991); *see Rosa v. Callahan*, 168 F.3d 72, 82–83 (2d Cir. 1999).

Reversals for the sole purpose of calculating benefits are only permitted where the present record shows persuasive proof of disability such that a remand for further proceedings would serve no useful purpose. *Williams v. Apfel*, 204 F.3d 48, 50 (2d Cir. 1999) (permitting an award of benefits where "the records provided persuasive evidence of total disability that rendered any further proceedings pointless").

## III.    DISCUSSION

### A.  Eligibility for SSI Benefits

The Social Security Act establishes that benefits are payable to individuals who have a disability. 42 U.S.C. § 423(a)(1). "The term 'disability' means . . . [an] inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . ." *Id.* § 423(d)(1)(A).  In order to determine whether a claimant is disabled within the meaning of the Social Security Act, the ALJ must follow a five-step evaluation process as promulgated by the Commissioner.

First, the ALJ must determine whether the claimant is engaged in substantial gainful activity. *Id.* § 404.1520(b); *see also id.* § 423(d)(2)(A) (stating that in order to be considered disabled, an individual's impairment must be "of such severity that he is not only unable to do his previous work but cannot . . . engage in any other kind of substantial gainful work which exists in the national economy," and "'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country").[3]

---

[3] The determination of whether such work exists in the national economy is made without regard to: 1) "whether such work exists in the immediate area in which [the claimant] lives;" 2) "whether a specific job vacancy exists for

If the claimant is not engaged in such activity, the ALJ must proceed to Step Two to determine whether the claimant has a severe, medically determinable impairment or combination of impairments. *Id.* § 404.1520(c). An impairment will be considered severe if it significantly limits a claimant's ability to perform "basic work activities." *Id.*

If the claimant has a medically determinable severe impairment, the ALJ proceeds to Step Three to determine whether any identified severe impairment meets or medically equals those identified in Appendix 1. *Id.* § 404.1520(d). These impairments are *per se* disabling, assuming a claimant meets the duration requirement. *Id.*

If the claimant's impairments are not *per se* disabling, then the ALJ proceeds to Step Four, which entails assessing the claimant's residual functional capacity, or their ability to work in light of their limitations. *Id.* §§ 404.1520(a)(4)(iv), 404.1520(e), 404.1545(a)(1).

At Step Four, the ALJ must establish whether the claimant's residual functional capacity will allow the performance of any past relevant work. If the claimant is unable to perform past relevant work, at Step Five, the ALJ bears the burden of proving that, accounting for the claimant's age, education, work experience, and residual functional capacity, the claimant can perform other work that exists in significant numbers in the national economy. *Id.* § 404.1520(g)(1). If the ALJ proves all of that, then the claimant is not disabled. *Id.*

The claimant bears the burden of proving the requirements of Steps One through Four, after which the burden shifts to the Agency to prove that the claimant is capable of working. *Carroll v. Sec'y of Health & Hum. Servs.*, 705 F.2d 638, 642 (2d Cir. 1983) ("The burden is on the claimant to prove that he is disabled within the meaning of the Act.  However, if the claimant

---

[the claimant];" or 3) "whether [the claimant] would be hired if he applied for work." 20 C.F.R. § 416.920(a)(4)(i)—(v).

shows that his impairment renders him unable to perform his past work, the burden then shifts to the Secretary to show there is other gainful work in the national economy which the claimant could perform.") (citations omitted).

### B.  The Underlying ALJ Decision

An ALJ's "[f]ailure to apply the correct legal standards is grounds for reversal." *Pollard v. Halter,* 377 F.3d 183, 189 (2d Cir. 2004) (citation modified). Legal error includes failure to adhere to the applicable regulations. *See Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). Generally, legal error requires remand to the agency. *See Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) ("Such an error ordinarily requires remand to the ALJ for consideration of the improperly excluded evidence . . . ."); *see also Shalala v. Schaefer*, 509 U.S. 292, 310 (1993) (Stevens, J., concurring) ("[A] court's order to remand a case pursuant to sentence four of § 405(g) necessarily means that the Secretary has committed legal error."). But rather than remand for further agency review, a court may reverse and enter judgment for the claimant "when the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose." *Parker v. Harris,* 626 F.2d 225, 235 (2d Cir. 1980). The relevant inquiry is whether there is "persuasive proof of disability" in the record, such that "further evidentiary proceedings would serve no purpose." *Id.*

In his February 2024 decision, ALJ Boyd made the following findings: that Matthew C.'s severe impairments included anxiety disorder and autism spectrum disorder; he had mild limitations in understanding, remembering, or applying information; he had moderate limitations in interacting with others; he had moderate limitations in concentrating, persisting, or maintaining pace; and he had moderate limitations in adapting or managing himself. *Id.* at 21-22.

Given these limitations, ALJ Boyd found that Matthew C. retained the RFC to perform a full range of work at all exertional levels, but with certain non-exertional limitations. Specifically, Matthew C. could perform simple, routine, repetitive tasks; sustain concentration, persistence, and pace for 2-hour segments; occasionally interact with supervisors; occasionally interact, non-collaboratively, with coworkers; interact with the public briefly and superficially for no more than ten percent of the workday; work with little/no changes in duties/routines; and have no work requiring independent judgment. *Id.* at 23.

ALJ Boyd found that the record supported Matthew C.'s alleged symptoms, but found that the intensity, persistence, and limiting effects of those symptoms were not entirely consistent with the evidence in the record. *Id.* at 24. ALJ Boyd found the opinions of Dr. Owen to be "partially persuasive," discounting only her later opinion that included a "more than 15% erosion in nearly every work function," which ALJ Boyd found to be "stark" and inconsistent with the treatment notes. *Id.* at 26. ALJ Boyd found the opinions of the state agency consultants to be "persuasive," crediting their findings that Matthew C. could perform short and simple tasks with sufficient concentration, persistence, and pace, and that he requires limited social interaction in a vocational setting. *Id.*

Matthew C. argues that the ALJ committed two reversible errors: first, the agency failed to develop the record because it discounted the opinion of Dr. Owen yet failed to obtain a statement from an agency consultant who had reviewed all of the medical records; and second, the ALJ failed to properly evaluate the opinion evidence because he disregarded Dr. Owen's opinion, "supplanted his own faulty opinion," and relied instead on the state agency consultants' "thin" opinions.

In response, the Commissioner argues that: first, there were no gaps in the administrative record, which included medical records and opinions from 2017 to 2023; and second, the ALJ properly determined that Dr. Owen's October 2023 opinion was neither supported by nor consistent with other substantial evidence in the record.

The Court discusses each argument in turn.

i.  The Development of the Record

"It is the rule in our circuit that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508–09 (2d Cir. 2009) (cleaned up) (citing *Tejada v. Apfel,* 167 F.3d 770, 774 (2d Cir. 1999)). "Whether the ALJ has satisfied this obligation or not must be addressed as a threshold issue." *Moreau v. Berryhill*, No. 3:17-CV-396 (JCH), 2018 WL 1316197, at *4 (D. Conn. Mar. 14, 2018). "Even if the ALJ's decision might otherwise be supported by substantial evidence, the Court cannot reach this conclusion where the decision was based on an incomplete record." *Id.* (quoting *Downes v. Colvin*, No. 14-CV-7147 (JLC), 2015 WL 4481088, at *12 (S.D.N.Y. July 22, 2015)).

An ALJ is required to obtain a "complete medical history for at least the 12 months preceding the month in which [a claimant] file[s] [an] application." 20 C.F.R. §§ 404.1512(b)(1), 416.912(b)(1). An ALJ must "make every reasonable effort to help [the claimant] get medical evidence from [his or her] own medical sources and entities that maintain [his or her] medical sources' evidence." *Id.* The regulations define "every reasonable effort" as an initial request for evidence from a medical source and, if the evidence is not received, one follow-up request to obtain the information. *Id.*

The obligation to develop the record is "enhanced when the disability in question is a psychiatric impairment." *Lacava v. Astrue*, 2012 WL 6621731, at *11 (S.D.N.Y. Nov. 27, 2012); *accord Gabrielsen v. Colvin*, 2015 WL 4597548, at *4 (S.D.N.Y. July 30, 2015) (citing cases). This is because a claimant's mental illness may greatly impede an evaluator's assessment of a claimant's ability to function in the workplace, thus necessitating a more thorough review. *See Gabrielsen*, 2015 WL 4597548, at *4 (noting that an individual with a mental disorder often "adopt[s] a highly restricted and/or inflexible lifestyle within which they appear to function well") (citation and internal quotation marks omitted).

Matthew C. argues that the Commissioner disregarded the opinion of Dr. Owen and relied "too heavily and inappropriately" on the non-treating, non-examining state agency physicians, "all while performing a superficial and erroneous review of the record evidence." Pl.'s Mem. at 14. He argues that the state agency consultants "did not have the bulk of the records," namely "75 pages of treatment over years and a treating physician opinion." *Id.* at 15. He argues that because ALJ Boyd "fail[ed] to even attempt to obtain medical source statements from a medical expert who had actually reviewed the medical records, the Administrative Record was not adequately developed." *Id.* at 16.

The Commissioner responds that the "Plaintiff's contention that the ALJ inadequately developed the evidence of record because he did not obtain a contemporaneous medical source opinion is unavailing" since the ALJ complied with regulations requiring him to obtain a "complete medical history for at least the 12 months preceding the month in which [a claimant] file[s] [an] application." 20 C.F.R. §§ 404.1512(b)(1), 416.912(b)(1); Def.'s Mem. at 7. The Commissioner also argues that because the administrative record, which includes medical

records and source opinions from 2017 to 2023, contains no obvious gaps and presents a complete medical history, the ALJ was under no obligation to seek additional information. *Id.*

The Court agrees.

Where "there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a claim for benefits." *Lowry v. Astrue*, 474 F. App'x. 801, 804 (2d Cir. 2012) (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999)); *Janes v. Berryhill*, 710 F. App'x 33, 34 (2d Cir. 2018) ("[t]he ALJ is not required to develop the record any further when the evidence already presented is adequate for [the ALJ] to make a determination as to disability"). Matthew C. filed his claim for benefits on April 26, 2022, alleging a disability onset date of January 1, 2017. Tr. at 21. The record includes extensive treatment notes, medical history, and medical source opinions starting as early as May of 2017, when Matthew C. began seeing LMFT Miller, and July of 2017 when he saw Dr. Kim Owen. *Id.* at 410-16. The most recent evidence and medical source opinions come from 2023 and 2024. *Id.* at 406, 9. Importantly, the record includes four medical source statements from Dr. Owen, all of which were completed after Matthew C. first filed for benefits. *See, e.g.*, *id.* at 289.

While Matthew C. may have complaints about the weight given to Dr. Owen's opinion and the propriety of the ALJ's reliance on the state agency consultants' opinions, those issues are better addressed subsequently. Because the record includes medical evidence and opinions from Matthew C.'s treating physicians regarding his impairments during the entirety of the relevant time period, the ALJ did not fail to adequately develop the administrative record.

Accordingly, the Plaintiff's motion is denied, and the Commissioner's motion is granted, on these grounds.

ii.  Evaluation of Opinion Evidence

In assessing the weight assigned to the medical opinions in the record, an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a).[4] The most important factors the agency will consider when evaluating the persuasiveness of medical opinions and prior administrative medical findings are supportability and consistency. *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). "Supportability focuses on the fit between medical opinion offered by the source and the underlying evidence presented by the source to support that opinion, while consistency focuses on how well a medical source opinion is supported by the entire record." *Gary L. v. Comm'r of Soc. Sec.*, 21-CV-01268-HKS, 2023 WL 8891437, at *4 (W.D.N.Y. Dec. 26, 2023).

Matthew C. argues that ALJ Boyd erred when he found that Dr. Owen's October 2023 opinion, namely the "15% erosion in nearly every work function," was unsupportable and inconsistent with her treatment notes. Pl.'s Mem. at 18-19. He argues that ALJ Boyd improperly substituted his own opinion for Dr. Owen's, and states that "a [m]edical expert was needed to assist in proper analysis of the [m]edical evidence." *Id.* at 20. Because the ALJ "fail[ed] to credit" Dr. Owen's "well-supported" opinion, Matthew C. argues that ALJ Boyd "create[d] a ripple effect of mistakes that cascade[d] through the step 5 analysis and result[ed] in reversible error." *Id.* at 21.

The Commissioner responds that the ALJ properly determined that Dr. Owen's opinion was neither supportable nor consistent with other substantial evidence in the record. Def.'s Mem.

---

[4] Because Matthew C.'s claim was filed after March 27, 2017, the treating physician rule does not apply to his claim. *See Rucker v. Kijakazi*, 48 F.4th 86, 98 n.3 (2d Cir. 2022) ("The Social Security Administration has repealed the treating physician rule for claims filed after March 27, 2017").

at 8. He argues that Dr. Owen's "overly restrictive opinion" is inconsistent with her treatment

records, which observe that Matthew C.'s mental status was "unremarkable but for situational

stressors due to being the primary caretaker of his elderly parents." *Id.* at 9. The Commissioner

also notes that Dr. Owen's October 2023 opinion "veers considerably" from her August 2022

and May 2023 opinions which stated that Matthew C. "had fair abilities to perform work-related

activities but for poor abilities to function independently as well as to deal with the public and

with work stresses." *Id.* Finally, the Commissioner argues that substantial evidence supports the

ALJ's determination that Dr. Uber's findings were persuasive, and the fact that Dr. Uber did not

review subsequent evidence does not invalidate her opinion because the subsequent evidence did

not differ materially from the evidence reviewed by the consultant. *Id.* at 10.

     The Court agrees.

     A district court will affirm the findings of the ALJ as long as the findings are supported

by substantial evidence, meaning "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Moran*, 569 F.3d at 112; see also *Brault*, 683 F.3d at 448

(finding this to be a "very deferential standard of review").

     Matthew C.'s treatment notes between May 2023 and October 2023 support the ALJ's

finding that Dr. Owen's October 2023 opinion was due less weight than her prior assessments.

The treatment notes include observations of impaired function. *See* Tr. at 395, 397 (Matthew C.

reported having a "mental breakdown" and feeling "more depressed" due to problems with his

parents); *id.* at 397-98 (Matthew C. demonstrated heightened anger, irritability, and anxiety due

to denied social security disability benefits and LMFT Miller's departure from the practice); *id.*

at 401 (Matthew C. reported worsening depression and anxiety due to caring for his parents,

resulting in resuming marijuana usage). The treatment notes also include observations of normal

and improving function. *See id.* at 395 (on May 11, 2023, the Plaintiff noted he quit smoking

marijuana); *id.* at 397 (observing that while his motivation was somewhat less, Matthew C.

continued to enjoy his usual activities, and his energy, appetite, and sleep remained unchanged);

*id.* at 403-404 (on August 2, 2023, Dr. Bennett opined that Matthew C. presented with a normal

mood and thought process); *id.* at 406 (on August 24, 2023, Matthew C. told Dr. Owen that he

was "pretty good").

    Although the medical evidence of record supports that Matthew C. was, at times,

experiencing worsening depression and anxiety due to situational factors such as conflict with

his parents, LMFT Miller's departure from the practice, and the denial of his social security

benefits, there is little evidence in the record supporting Dr. Owen's more restrictive findings

that Matthew C. would be "off-task" for more than thirty percent of the day, absent from work

five days or more per month, unable to complete a workday five days or more per month, and

perform his job on a sustained basis less than fifty percent of the time. *Id.* at 393-94. Even if

there was evidence in the record to show that Matthew C.'s conditions were worsening

considerably towards the end of 2023, the record does not show that Matthew C. was

experiencing such symptoms with the consistency and longevity necessary to establish disability.

*See Barnhart v. Walton*, 535 U.S. 212, 217 (2002) (noting that "the statutory definition of

'disability'. . . adds that the 'impairment' must be one that 'has lasted or can be expected to last .

. . not less than 12 months'").[5]

---

[5] Significantly, it was not until July 1, 2024, several months after ALJ Boyd's decision on February 8, 2024, that Dr. Owen opined on the impact of the December 2023 death of Matthew C.'s father on Matthew C.'s mental health and capacity to work. *See* Tr. at 9 ("When his father died in early December 2023, he greatly decompensated and he became less functional. My opinion is that he would not be able to function in a work environment more than 1-2 hours for 2-3 days per week since that time to now."). In other words, this record evidence is well past the alleged onset date of disability of January 1, 2017, and was not – because it could not be – raised during the October 24, 2023 hearing, much less adequately considered in the February 8, 2024 decision. Of course, that does not mean that such issues cannot and should not be addressed in another application on Matthew C.'s behalf. *See, e.g., Melkonyan v. Sullivan*, 501 U.S. 89, 92 (1991) (Claimant's first application for SSI disability benefits had been denied by

Matthew C. asserts that the ALJ failed to "even attempt to obtain medical source statements from a medical expert who had actually reviewed the medical reports." Pl.'s Mem. at 16. Presumably, Matthew C. takes issue with the qualifications of the state agency consultants, who were not medical doctors. *See* Tr. at 67-74, 81 (Michelle Leveille is a Doctor of Psychology and Susan Uber is a Doctor of Philosophy). But state agency consultants routinely include professionals who, despite not being medical doctors, have medical expertise. In fact, the agency's post-2017 regulations "elevate other health care providers to the same level as treating physicians," encouraging ALJs to "move away from evaluating treating providers primarily on whether they have an M.D., D.O., or Ph.D." *Novaro v. Comm'r of Soc. Sec.*, 511 F. Supp. 3d 243, 246 (E.D.N.Y. 2020); *see also Tyson v. Astrue*, 2010 WL 4365577, at *10 (D. Conn. June 15, 2010), *report and recommendation adopted*, 2010 WL 4340672 (D. Conn. Oct. 22, 2010) ("State agency medical and psychological consultants . . . are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation.") (citing 20 C.F.R. § 404.1527(f)(2)(I)). ALJs "may rely on the opinions of non-examining state agency medical consultants, 'since such consultants are deemed to be qualified experts in the field of social security disability.'" *Kya M. v. Comm'r of Soc. Sec.*, 506 F. Supp. 3d 159, 164–65 (W.D.N.Y. 2020) (internal citation omitted).

The state agency consultants did not review all of the available medical records, only evidence spanning from June 2022 to May 2023. *See* Tr. at 79. But "[a]n ALJ has discretion to weigh the opinion of a consultative examiner and attribute the appropriate weight based on his review of the entire record." *Guerra v. Comm'r of Soc. Sec.*, No. 1:16-CV-00991(MAT), 2018 WL 3751292, at *7 (W.D.N.Y. Aug. 7, 2018), aff'd, 778 F. App'x 75 (2d Cir. 2019). And ALJ

---

Appeals Council, and shortly before filing a complaint seeking judicial review, claimant filed a second application for SSI disability benefits accompanied by new evidence, which was granted).

Boyd used the consultants' opinion primarily to affirm Dr. Owen's findings that Matthew C. was able to perform short and simple tasks, but not complicated tasks. Tr. at 26. As a result, ALJ Boyd did not err in relying on the state agency consultants' opinions.

Accordingly, the Plaintiff's motion is denied, and the Commissioner's motion is granted, on these grounds.

### C.  EAJA Fees

In order to obtain an award of attorney's fees under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(d), the moving party must show

> (1) that the claimant be a 'prevailing party'; (2) that the Government's position was not 'substantially justified'; (3) that no 'special circumstances make an award unjust'; and (4) pursuant to 28 U.S.C. § 2412(d)(1)(B), that any fee application be submitted to the court within 30 days of final judgment in the action and be supported by an itemized statement.

*Kerin v. U.S. Postal Serv.*, 218 F.3d 185, 189 (2d Cir. 2000) (quoting *Comm'r, INS v. Jean*, 496 U.S. 154, 158 (1990)). Because Matthew C. is not a prevailing party, he is not entitled to an award of attorney's fees.

Accordingly, Matthew C.'s motion for EAJA fees is denied.

### IV.    CONCLUSION

For the reasons explained above, Matthew C.'s motion for reversal and remand is **DENIED** and the Commissioner's motion for an order affirming his decision is **GRANTED**.

The Clerk of the Court is respectfully directed to enter judgment for the Commissioner and to close this case.

**SO ORDERED** at New Haven, Connecticut, this 6th day of March, 2026.

/s/ Victor A. Bolden
VICTOR A. BOLDEN

UNITED STATES DISTRICT JUDGE